McNEES WALLACE & NURICK LLC
Jonathan H. Rudd
Attorney I.D. No. PA 56880
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
Phone: (717) 237-5405
Fax: (717) 260-1737
jrudd@mwn.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REBECCA G. PENNELL | : | |
| 1373 John Adams Drive | : | |
| Lancaster, PA 17601 | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | No. |
| | : | |
| PRINCIPAL LIFE INSURANCE COMPANY | : | |
| 711 High Street | : | |
| Des Moines, IA 50392 | : | |
| Defendant | : | |

## COMPLAINT

## PARTIES

1.      Plaintiff is Rebecca G. Pennell ("Dr. Pennell"), an adult individual with

a principal place of residence at 1373 John Adams Drive, Lancaster, Lancaster

County, Pennsylvania, 17602.

2.      Defendant is Principal Life Insurance Company ("Principal"), an Iowa corporation with its principal place of business at 711 High Street, Des Moines, IA 50392.  Principal is licensed to carry out an insurance business in Pennsylvania and does business throughout the state of Pennsylvania and specifically in the Eastern District of Pennsylvania.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C §1331, in that this matter involves a claim for benefits brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §1132(a)(1)(B). This Court has jurisdiction pursuant to 29 U.S.C. §1132(e)(1).

4.      Venue is proper in this District in accordance with 28 U.S.C. §1391(b) and 29 U.S.C. §1132(e)(2), in that a substantial part of the events giving rise to the claim occurred in this District and Defendant may be found in this District.

## FACTUAL BACKGROUND

A.      Dr. Pennell's Responsibilities as a Radiologist

5.      At all times relevant to this matter Dr. Pennell was a licensed Radiologist.  Dr. Pennell graduated from Hahnemann Medical College in 1980 and subsequently did a residency in Radiology at Temple University Hospital.  Dr. Pennell is board certified in Diagnostic Radiology.

6.      Dr. Pennell practiced with Lancaster Radiology Associates, LTD ("LRA") for over twenty-eight years prior to resigning as a shareholder of LRA

2

effective June 30, 2019.   Dr. Pennell continued her affiliation with LRA as an employee from July 1, 2019 into November 2020.

7.     In 2018, Dr. Pennell worked a full time schedule as a 75% partner at LRA.  A 75% partner received increased block vacation time, and also only had to perform 75% of the evening, night and weekend shifts.  Otherwise, a 75% partner worked a full schedule and could be required to work 9 consecutive days.

8.     LRA covered Lancaster General Hospital ("LGH") 24/7, 365 days per year based on a contract between LRA and LGH. LRA maintained multiple shifts for each 24 hour time period, including weekend and holiday coverage.   Specifically, LRA maintained the following shifts:

Midnight shift: 12 am to 7 am for 7 days in a row, Saturday- Friday (two times per year). Worth two times a day pay rate. Continuous work with no breaks.

Evening shift 1: 4 pm to 12 am for 7 evenings in a row, Sat to Fri (two times per year). Worth 1.6 times a day rate.  Continuous work with no breaks.

Evening shift 2: 4 pm to 12 am 5 nights in a row. (two times per year). Worth 1.6 times a day rate.  Continuous work with no breaks.

Day shift: 8 am to 5:30 pm. Rotating occasionally 7 am to 5:30 pm. Specialty work with procedures and general and specialty image readings, half hour lunch breaks.

Late day shift: 10 am to 7 pm. Continuous general image reading with half hour lunch break.

Weekend 1: 7 am to 4 pm Saturday and 11 am to 8 pm Sunday.  (Four weekends per year per partner).  Worth 1.7 day rate.

Weekend 2: 11 am to 8 pm Saturday and 7 am to 4 pm Sunday.

Extra weekend evening coverage shift: 8pm-12 am, Sat and Sun.

Holiday Shift.   Same as weekend shifts.

9.      Dr. Pennell's job responsibilities required her to work at numerous different facilities and perform many different tasks.  Most all of these tasks involved reviewing information on up to five large (5) computer monitors that were arranged side by side in a large curve that required Dr. Pennell to constantly rotate and move her head and neck from side to side and up and down thousands of times a day.

10.     The job responsibilities of a Radiologist result in the constant side to side and up and down movement of the head and neck.   The following are a few of the type of tasks performed by Dr. Pennell when she was working as a Radiologist and the type of movements of the head and neck she had to make to perform her job:

Sonograms

The average number of head turns for a normal sonogram reading are 8 to the left and 8 to the right per case.

There are an average of 35 sonograms read per daytime shift. Reporting of sonograms involves typing into a reporting program with very tiny font.

CT, Xray, MRI

MRI abdomen or MRI pelvis with comparisons. Up and down head movements: 25. The average number of head turns to the left are 10 and to the right are 12.   Cases per average day shift: 3-4.

CT abdomen and pelvis with comparisons. The average number of head turns to the left and right are 12 and up and down head movements are 12.

CT chest with comparisons.   This reading involves much more than 12 head turns and movements to the left and right and up and down.

CT Cases per evening shift: 35.  CT cases per weekend day shift: 40

Plain film xrays.  The average number of up and down head movements is 3 and left to right head movements is 6 for this reading.   The average cases read per day shift is 20-30, per evening shift is 50-60, and per weekend shift is 50-60.

4

Specialty day work

Screening mammography.   This involves reading 70 cases in a 4 hour time period, with a minimum of 6 head turns from left to right and ten up and down head movements per case.  This shift is once every week.

Fine needle biopsy program:   8 biopsies in 4 hours.    This involved a fixed position of head and shoulders during needle biopsy procedure while watching ultrasound screen. This was performed once per month.

Peer review cases per day:  In addition to standard workload there were typically 6 cases that needed to be studied as part of peer review process.

   B.     Long Term Disability Insurance Coverage Issued By Principal

11.     Principal issued Group Long Term Disability Insurance for certain physicians working for LRA.   A true and correct copy of the Group Booklet – Certificate provided by Principal to LRA describing the group long term disability insurance is attached hereto and incorporated herein as Exhibit 1.  Dr. Pennell believes and alleges that the Group Booklet – Certificate is an accurate representation of the terms of the Group Policy.   Principal has never provided Dr. Pennell with the actual Group Policy and has relied on the provisions set forth in the Group Booklet – Certificate in its communications with Dr. Pennell.

12.     Dr. Pennell was eligible for group long term disability insurance with Principal since she was considered a Member as of the December 1, 2017, the effective date of coverage.

13.     The Group Booklet – Certificate sets forth the following requirements to qualify for benefits:

You will qualify for Disability benefits, if all of the following apply:

a. You are Disabled under the terms of the Group Policy.

b. Your Disability begins while you are insured under the Group Policy.

c. Your Disability is not subject to any of the Limitations listed in this booklet.

d. An Elimination Period of 90 days is completed.

e. A Benefit Payment Period is established.

f. You are under the Regular and Appropriate Care of a Physician.

g. The claim requirements listed in the CLAIM PROCEDURES Section are satisfied.

14.      The Group Booklet – Certificate defines "Disability" and "Disabled" as follows:

You will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy:

During the Elimination Period and Benefit Payment Period, one of the following applies:

a. You cannot perform the majority of the Substantial and Material Duties of your Own Occupation.

b. You are performing the duties of your Own Occupation on a Modified Basis or any occupation and are unable to earn more than 80% of your Indexed Predisability Earnings.

The loss of a professional or occupational license or certification does not, in itself, constitute a Disability.

15.      The Group Booklet – Certificate provides that the maximum monthly benefit is $15,000.

16.      The Group Booklet – Certificate provides that that maximum benefit payment period for anyone that becomes disabled before age 65 is the greater of 36 months or up to the Member's Social Security Normal Retirement Age.

C.      Dr. Pennell's Claim for Benefits

17.      Prior to January 1, 2019, Dr. Pennell had been diagnosed with Degenerative Disc Disease, Degenerative Spine Disease of the cervical spine, and repetitive stress syndrome/injury brought on by the constant of her head and neck in performing her job as a Radiologist.   This all resulted in global generalized soft tissue and joint mobility restrictions of the cervical spine and thoracic spine, limited range of motion in rotation and extension of the neck, postural pain, palpable tenderness, decreased scapular strength, impaired breathing mechanics,  sternocleidomastoid muscle spasm and trigger points, upper trapezius and cervical and upper thoracic paraspinal muscle spasm and trigger points.

18.      In 2018 and thereafter Dr. Pennell experienced left sternocleidomastoid pain radiating into the mastoid area scalp, left ear and over the left convexity scalp into the left eyebrow.

19.      In 2018 and thereafter Dr. Pennell suffered from facet joint arthritis, and the ensuing pain caused localized paraspinal peritendinous and paraspinal soft tissue inflammation and spasm. Repetitive movement worsened the arthritis.

20.      Prior to 2018 and continuing at all times thereafter Dr. Pennell suffered from degenerative disc disease, predominantly seen at C5-6 and C 6-7, although present at all the levels. Retrolisthesis at C6-7 caused limited range of motion. Beginning in 2018 marginal vertebral osteophytes from disc degeneration were seen on an Xray extending from C4-T1.  This caused intervertebral foraminal narrowing at several levels. Uncovertebral joint arthritis and spurs caused neural foraminal narrowing from C4-7, which irritated the nerve roots causing upper extremity numbness.  The bony changes were not reversible.

7

21.     Beginning in 2018 and continuing on a routine basis thereafter trigger point injections were performed in the areas of localized painful muscle spasm which extend from the bilateral suboccipital areas bilaterally into the sternocleidomastoid, trapezius, cervical and upper thoracic paraspinal muscles bilaterally, worse on the left.

22.     Beginning in 2018 and continuing on a routine basis thereafter Dr. Pennell received physical therapy to help her continue working on a limited basis and to just be able to perform the daily activities of living.

23.     Dr. Pennell's job responsibilities resulted in thousands of head rotations and turns to left and right and up and down each day.  Dr. Pennell was able to obtain only limited relief while standing and the modification to a right sided monitor. Standing could be accomplished about 60% of the day, as recommended by practitioners, due to dependent edema. Up and down cervical flexion and extension could not be eliminated due to toolbar layouts on the monitors.

24.     Dr. Pennell's symptoms would generally start about three hours into the workday, depending on the complexity of the imaging studies being read. The more complex studies with multiple electronic image data sets such as MRI of the abdomen with contrast with multiple comparison studies caused immediate pain and spasm.

25.     Sonograms, Dr. Pennell's specialty, caused exaggerated neck flexion due to the structured reporting software requiring typing into a window with tiny font rather than dictation.

26.     Beginning in January 2019, Dr. Pennell could only work three days in a row and could no longer physically endure the pain associated with working more than 3 days in a row.  She did work evenings on January 1, 4, 5 and 6, 2019 since

8

this had already been scheduled and she could not find a replacement.  However, this is the last evening or night shift that she worked.  Although she was scheduled for two additional evening or night shifts during the six month period through June 30, 2019, she had to in essence pay for other Radiologists to cover these shifts for her since she was not physically capable of handling evening or night shifts due to her neck condition.

27.     As a result of the inability to perform as a full-time Radiologist for LRA Dr. Pennell resigned as a shareholder effective June 30, 2019.   Dr. Pennell then continued to work two days a week for LRA as an employee until she was no longer even able to work two days a week and resigned completely in November 2020.

28.     On July 1, 2019, Dr. Pennell applied for long term disability coverage with Principal.   A copy of the Employee Statement, Attending Physician Statement, and Employer Statement are attached hereto as Exhibit 2.

29.     The Attending Physician Statement completed by Dr. Mark Simmons, who as Dr. Pennell's treating physician for many years, identified Dr. Pennell's complications as:  "Multilevel DDD [Degenerative Disc Disease] and DSD [Degenerative Spine Disease] cervical spine, sleep disorder, chronic neck pain, exacerbated daily by frequent head movement."  (Exhibit 2).   Dr. Simmons identified the objective findings as "Xrays available confirming above".

30.     As of July 1, 2019, Dr. Simmons supported return to work on a part-time basis for only 2 days a week at a greatly reduced level of compensation.  (Exhibit 2).

D.   Principal's Denial of Benefits

31.   On October 3, 2019, Principal sent Dr. Pennell a letter contending that she was not eligible for long term disability benefits on the basis that she could allegedly perform her Own Occupation full time (the "Denial Letter").   A copy of the Denial Letter is attached hereto as Exhibit 3 (without policy provision pages).

32.   Principal indicated in the Denial Letter that it had requested a file review by Dr. Hendricks as part of its evaluation of Dr. Pennell's claim for benefits.

33.   Principal claimed in the Denial Letter that:  "Cervical degeneration on x-rays is not predictive of symptoms or function" and that "There is no change in physical examination findings from November 2017 through June 2019 per Pain Management to support an ability to work only 2 days per week."   Principal went on to state that:   "Based on this it was concluded that there is no date when part time restrictions are supported.   You could perform full time work with an ergonomic work station."   (Exhibit 3).

34.   As a result of the Covid-19 pandemic and for other reasons Principal extended the period for Dr. Pennell to appeal from its denial of benefits.

35.   On December 31, 2021, Dr. Pennell submitted her appeal to Principal (the "Appeal Letter").   A copy of the Appeal Letter (without exhibits) is attached hereto as Exhibit 4.

36.   In the Appeal Letter, Dr. Pennell responds to each one of the reasons for Principal's denial of benefits and explains in detail the reason she could not continue working full time as a Radiologist after January 1, 2019.   She also pointed out all the objective evidence supporting her position, including the medical records

from Dr. Simmons, Dr. Ton That, and the voluminous physical therapy records that Principal had apparently never considered as part of its initial determination.

37.     Following receipt of the Appeal Letter, Principal scheduled Dr. Pennell for an Independent Medical Examination ("IME") with Dr. John Kline of Northeast Rehab.

38.     Dr. Kline performed an IME on April 11, 2022 and subsequently issued a Physiatric Independent Medical Examination (the "IME Report").   A copy of the IME Report is attached hereto as Exhibit 5.

39.     Dr. Kline agreed with the diagnosis of degenerative osteoarthritis/disc disease of the cervical spine, resulting in chronic cervicalgia and shoulder pain. (Exhibit 5 at p. 7).

40.     Dr. Kline also opined that Dr. Pennell had suffered a work-related injury ("Dr. Rebecca Pennell is a 67-year-old, 5'4", 120-pound, left-handed female, who in my professional opinion, with a reasonable degree of medical certainty, incurred a work-related injury, as previously indicated above.") (Exhibit 5 at p. 8).

41.     Dr. Kline further agreed with the treatment Dr. Pennell had been receiving ("The treatment that Dr. Pennell has received to date in regards to her cervical spine clearly has been both medically appropriate and reasonable. The utilization of anti inflammatory medications, periodic physical therapy, home exercise program, as well as periodic trigger point injections are both medically appropriate and reasonable.") (Exhibit 5 at p. 8).

42.     Despite agreeing with the diagnosis of degenerative osteoarthritis/disc disease of the cervical spine, concluding that Dr. Pennell had suffered a work-related

injury, and agreeing the extensive treatment she had received for her neck disease

and injury was appropriate, Dr. Kline went on to conclude that:  "Dr. Pennell clearly

would be capable of performing her own occupation job full-time, full duty from an

objective standpoint on both clinical examination or through her diagnostic workup.

Dr. Pennell's limitations appear to be self-limiting in nature and based solely upon her

subjective complaint.  Though she does demonstrate mild decreased range of motion

in the cervical spine actively, it is clearly within a functional range."   (Exhibit 5 at pp.

8-9).

43.     Principal provided Dr. Pennell with the opportunity to submit additional

information after receipt of Dr. Kline's IME Report before making its decision on Dr.

Pennell's appeal.

44.     On May 19, 2022, Dr. Pennell submitted additional information in

support of her appeal and in rebuttal to Dr. Kline's IME Report.   A copy of the letter

transmitting the additional information and a copy of Dr. Simmons' report of May 12,

2022 is attached as Exhibit 6.

45.     Dr. Simmons concludes his report of May 12, 2022 with the statement

that:

> In summary, Dr. Pennell continues with chronic neck pain.  She has continued
> to seek ongoing care with physical therapy and pain management despite no
> longer working.  This patient's medical record shows a direct relationship
> between her injury and her employment causing a chronic condition with
> objective evidence for the need for ongoing care. Dr. Pennell's objective
> functional status is in direct conflict with Dr. Kline's conclusion that she could
> perform her full time job with no limitations.  This statement ignores years of
> objective evidence to the contrary.  It continues to be my opinion to a
> reasonable degree of medical certainty that Dr. Pennell is not able to work full
> time, full duty, and has not been able to do so since January 1, 2019, for all of
> the reasons stated above and in my prior letters and statements.

(Exhibit 6 at Exhibit A, p. 4).

46.     Dr. Pennell also pointed out that in at least two reported cases, Pennsylvania Courts had rejected Dr. Kline's opinion where he had not seen the claimant around the time of the onset of the disabling condition.   See Scott & Longacre Trucking v. Workers' Comp. Appeal Bd. (Darrow), 2017 Pa. Commw. Unpub. LEXIS 806; 178 A.3d 975 (Pa. Cmwlth 2017); Furnari v. Workers' Comp. Appeal Bd. (Temple Inland), 90 A.3d 53 (Pa. Cmwlth 2014).   Dr. Pennell pointed out that Dr. Kline had seen Dr. Pennell for the first and only time over 3 years after the disability date of January 2019 and approximately eighteen months after she had last worked as a Radiologist and no longer was experiencing the exacerbation of her symptoms caused by her work.

47.     On June 20, 2022, Dr. Kline submitted a supplemental report wherein he once again acknowledges that Dr. Pennell "clearly does demonstrate degenerative osteoarthritis/disc disease of the cervical spine of a chronic nature".   A copy of Dr. Kline's supplemental report is attached as Exhibit 7, p. 2.   Dr. Kline went on to state that:  "Dr. Pennell did demonstrate subjective symptomatology, which may be in keeping with temporary exacerbations of her degenerative osteoarthritis, as well as disc disease of the cervical spine, with occasional numbness and tingling in the hand, involving the middle and three fingers."   (Exhibit 7 at p. 3).   However, despite the acknowledged disease and subjective symptomology Dr. Kline opined that Dr. Kline could work a full time schedule, meaning she could work 9 hours a day for up to 9 days straight, where she would be moving her head and neck from side to side and up and down thousands of times each day.

48.      On July 17, 2022, Principal notified Dr. Pennell that it was reaffirming its decision to deny benefits (the "Reaffirmance Letter").   A copy of the Reaffirmance Letter is attached as Exhibit 8 (without policy provision pages).

49.      Principal relied almost exclusively on Dr. Kline's opinion in the Reaffirmance Letter and seemingly rejected all of Dr. Simmons' opinions as Dr. Pennell's treating physician.   Principal concludes its analysis with the statement that:

> In reviewing the medical documentation from Dr. Pennell's providers, the medical records don't show any objective data to support restrictions and limitations that would prevent Dr. Pennell from performing her occupation as a Radiologist beyond 01/01/2019. The X-rays and MRI of the cervical spine did show degenerative osteoarthritis and degenerative disc disease. However, Dr. Pennell did not demonstrate clinical objective evidence of cervical radiculopathy. She had normal strength, sensation, as well as deep tendon reflexes. There was no evidence of atrophy, nerve root impingement on diagnostic studies and no radicular complaints. Based on our review, it has been determined that Dr. Pennell. doesn't meet the definition of disability and we are upholding our original decision to deny LTD benefits.

(Exhibit 8 at p. 4).

## COUNT I – CLAIM FOR BENEFITS UNDER 29 U.S.C. §1132(a)(1)(B)

50.      Plaintiff incorporates herein by reference paragraphs 1 through 49 above as if set forth herein at length.

51.      Dr. Pennell has been Disabled since January 1, 2019 since she has been unable to earn more than 80% of her Indexed Predisability Earnings due to working on a Modified Basis because of her cervical spine disease and work related repetitive stress injury.

52.     Dr. Pennell has been Disabled since November 2020 since she has been unable to perform the majority of the Substantial and Material Duties of her Own Occupation since she has not been able to perform any work as a Radiologist.

53.     Dr. Pennell's Indexed Predisability Earnings were in excess of $45,000 per month.

54.     Dr. Pennell has never earned 80% of her Indexed Predisability Earnings since January 1, 2019.

55.     The end of the 90 day elimination period for Dr. Pennell's receipt of long term disability benefits was March 31, 2019.

56.     Dr. Pennell has been entitled to receive long term disability benefits since April 1, 2019 and for the three years thereafter.

57.     Dr. Pennell has been entitled to receive long term disability benefits in the amount of $15,000 per month since April 1, 2019, which is the maximum monthly benefit permitted under the Group Long Term Disability Insurance Policy.

58.     Dr. Pennell  is owed $540,000 in long term disability benefits for the thirty-six months from April 1, 2019 through April 1, 2022.

59.     Dr. Pennell is owed pre-judgment interest on all past due benefits.

60.     Principal acted in an arbitrary and capricious manner in denying Dr. Pennell's claim for benefits.

61.     Principal's decision denying Dr. Pennell's claim for long term disability benefits was without reason, unsupported by substantial evidence, and erroneous as a matter of law.

62.     Dr. Simmons diagnosed Dr. Pennell with Multilevel Degenerative Disc Disease and Degenerative Spine Disease of the cervical spine, chronic neck pain, exacerbated daily by frequent head movement, and Principal has never disagreed with this diagnosis.

63.     Dr. Kline also agreed that Dr. Pennell was suffering from degenerative osteoarthritis and degenerative disc disease and that Dr. Pennell did demonstrate subjective symptomatology, which may be in keeping with temporary exacerbations of her degenerative osteoarthritis, as well as disc disease of the cervical spine.

64.     Dr. Kline also agreed that Dr. Pennell was suffering from a work-related injury, specifically, the repetitive stress injury caused by Dr. Pennell having to constantly rotate her head and neck and move it up and down to perform her job as a Radiologist.

65.     Despite Dr. Pennell's well diagnosed disc and cervical spine disease and work-related repetitive stress injury, Principal wrongfully concluded that:  "In reviewing the medical documentation from Dr. Pennell's providers, the medical records don't show any objective data to support restrictions and limitations that would prevent Dr. Pennell from performing her occupation as a Radiologist beyond 01/01/2019." Principal's conclusion is inconsistent with its very next admission that:   "The X-rays and MRI of the cervical spine did show degenerative osteoarthritis and degenerative disc disease."   The documented degenerative osteoarthritis and degenerative disc disease is objective evidence that supports Dr. Pennell's claim.   It is inconsequential whether Dr. Pennell was also suffering from cervical radiculopathy, since the degenerative osteoarthritis and degenerative disc disease when exacerbated by

thousands of rotations and up and down movements of the head and neck each day provides ample support for the conclusion that Dr. Pennell could be suffering from debilitating pain that prevented her from performing her occupation as a Radiologist for nine hours a day for up to nine days in a row.

66.     Principal's apparent requirement that Dr. Pennell provide some objective evidence of the pain she was experiencing when she had to constantly move her neck side to side and up and down in order to perform her work as a Radiologist is erroneous as a matter of law. This Court, and numerous other courts, have repeatedly rejected long term insurance company's attempts to discount the insured's subjective complaints of pain to support a disability claim.  By its very nature, pain is subjective despite that it can be very debilitating to the individual suffering pain and can prevent them from performing their occupation.   There is ample objective evidence that someone suffering from degenerative osteoarthritis, degenerative disc disease and a work-related repetitive stress injury could suffer debilitating pain if they had to move the region impacted by the disease and injury thousands of times a day.

67.     It is also significant that nowhere in the Group Policy is there any Limitation for disabilities that are based in whole or in part on subjective complaints. Principal is in essence attempting to rewrite the Group Policy to include a Limitation that nowhere exists in the Group Policy.   Principal's conduct in this regard is erroneous as a matter of law.

68.     Principal's determination that Dr. Pennell could perform her Own Occupation on a full-time basis without giving any consideration to the specific job

17

requirements of a Radiologist in a similar position as Dr. Pennell was erroneous as a matter of law, without reason and not supported by substantial evidence.

69.     Principal's rejection of Dr. Simmons' opinions that Dr. Pennell was not able to perform the job requirements of a Radiologist on a full-time basis and then his later opinion that she could not perform these job requirements on any basis is without reason and not supported by substantial evidence.

70.     Principal failed to appropriately consider Dr. Pennell's job responsibilities in denying her claim for long term disability benefits.  Although Dr. Pennell was not a manual laborer required to perform heavy lifting, she still needed to be able to physically move her head and neck thousands a times a day to be able to perform her full-time job duties and she simply was not able to do so as a result of her degenerative osteoarthritis, degenerative disc disease and work-related repetitive stress injury.  Contrary to Principal's apparent conclusion that Dr. Pennell's job was solely of "a cognitive nature", Dr. Pennell was required to be very active in terms of rotating her head from side to side and up and down thousands of times a day. Regardless of whether this qualifies as being "excessively physical", it was a basic requirement for Dr. Pennell to perform her job that she was not able to perform on a full-time basis for up to nine consecutive days without suffering debilitating pain.

71.     Principal also ignored the magnitude of treatment being received by Dr. Pennell so that she could continue to work part-time, treatment that Dr. Kline agreed "has been both medically appropriate and reasonable."   In 2019 alone, Dr. Pennell had ten trigger point injections and went to physical therapy fifteen times, not to mention numerous office visits.   Each one of these procedures, treatments and

18

appointments took hours out of Dr. Pennell's day and the trigger point injections had at least a four hour recovery time.   It would have been impossible for Dr. Pennell to work nine hours a day for up to nine days straight based on the amount of treatment she was receiving, not even taking into account the debilitating pain she experienced from rotating and moving her head and neck thousands of times a day.

72.    Principal's contention that there was no appreciable change in Dr. Pennell's condition pre and post January 1, 2019 is both erroneous and immaterial. Initially, the MRI performed subsequent to January 1, 2019 showed a continuation of the degenerative changes to the cervical spine.  Further, by its very nature an individual's ability to tolerate a repetitive stress injury can decrease over time for many reasons.  As time went on Dr. Pennell simply could not continue to perform at the high level of a full-time Radiologist without suffering debilitating pain regardless of whether her physical condition had changed "appreciably".

73.    Principal also failed to appropriately evaluate Dr. Pennell's claim for the time period that she continued to work, *i.e.* January 2019 through November 2020. The standard for determining Dr. Pennell's entitlement to benefits during this time period was whether she was performing her occupation as a Radiologist on a Modified Basis because or her degenerative osteoarthritis, degenerative disc disease and work-related repetitive stress injury and whether she was unable to earn more than 80% of her Indexed Predisability Earnings because of her modified work schedule.   Dr. Pennell clearly was not earning 80% of her Indexed Predisability Earnings following January 1, 2019, and the reason for this decline in earnings is that Dr. Pennell was no longer able to work full-time for up to nine consecutive days.   After July 1, 2019, Dr.

Simmons had restricted Dr. Pennell to only working two days a week and it was entirely reasonable for Dr. Pennell to follow the restrictions imposed by Dr. Simmons. Further, in September 2020 , Dr. Simmons recommended that Dr. Pennell discontinue all work as a Radiologist due to the significant impact her continued work was having on her physical well-being.  As Dr. Simmons noted, Dr. Pennell's condition significantly improved when she was temporarily off work due to Covid-19 restrictions, but the same symptoms almost immediately reappeared once Dr. Pennell returned to work after the Covid-19 restrictions were eased.

74.     It is apparent that in denying Dr. Pennell's claim for long term disability benefits Principal was no acting as a disinterested fiduciary but as a financially motivated insurance company seeking to pay less money out in benefit claims. Principal completely ignored and rejected Dr. Simmons' opinions as Dr. Pennell's long-time treating physician and accepted every one of Dr. Kline's opinions despite that Dr. Kline only examined Dr. Pennell once for a very short period of time after she had not being working for eighteen months and was not experiencing the exacerbation of her degenerative osteoarthritis, degenerative disc disease and work-related repetitive stress injury associated with rotating and moving her head and neck thousands of time a day while working as a Radiologist.  Principal also completely ignored the internal inconsistences in Dr. Kline's report where he admits that Dr. Pennell is suffering from degenerative osteoarthritis and degenerative disc disease and had a work-related repetitive stress injury that was exacerbated by the continued movement of Dr. Pennell's head and neck, but then concluded that there was no objective evidence to support Dr. Pennell's claim.

75.      Dr. Pennell has met all other conditions to receiving benefits that are set forth in the Group Policy.

76.      Principal's denial of Dr. Pennell's claim for long term disability benefits should be overturned and it should be ordered to pay her for all past due benefits, together with pre-judgment interest.

77.      Principal acted in bad faith and/or culpably in denying Dr. Pennell's claim for long term disability benefits.  For all of the foregoing reasons and those set forth in the voluminous administrative record, there was no reasonable basis for Principal's denial of coverage and its reasons are both contrived and internally consistent.   It is apparent that Principal realized that it owed Dr. Pennell significant money and it undoubtedly hoped that by forcing Dr. Pennell to file suit it could save some money by negotiating a settlement where it paid less than the benefits owed under the Group Policy.   An insurance company acts in bad faith where it denies claims for no other reason than to try and save money in settling claims after litigation is commenced.

78.      Principal should be required to pay Dr. Pennell all attorneys' fees and costs incurred in this matter pursuant to 29 U.S.C. §1132(g)(1) and the standard established by the Third Circuit for the award of attorneys' fees in these type of cases.

WHEREFORE, Plaintiff Rebecca G. Pennell demands judgment in her favor and against Defendant Principal Life Insurance Company for $540,000, together with pre-judgment interest, attorneys' fees and costs.

Respectfully submitted,

McNEES WALLACE & NURICK  LLC

By  /s/ Jonathan H. Rudd 3807
Jonathan H. Rudd
Attorney I.D. No. PA 56880
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 237-5405
Fax: (717) 260-1737
jrudd@mwn.com

Attorneys for Plaintiff Rebecca G. Pennell

Dated: September 28, 2022